**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **DAVID TOM,** individually and on behalf of all others similarly situated, | Case No. 1:25-cv-00566-GTS-DJS |
| *Plaintiff,* | **CLASS ACTION** |
| *v.* | **JURY TRIAL DEMANDED** |
| **DELANCEY STREET GROUP LLC** | |
| **and** | |
| **MJA HOLDINGS, INC. d/b/a MCA JUSTICE** | |
| *Defendant.* | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
DELANCEY STREET GROUP LLC'S MOTION TO DISMISS**

I.    CONTENTS

**II.    Introduction** ........................................................................................................ 1

**III.    Factual Background** ............................................................................................ 1

**IV.    Legal Standard** .................................................................................................. 3

**V.    Argument** ........................................................................................................... 4

    A.    Mr. Tom is a "residential telephone subscriber" under the TCPA. ................................. 4

    B.    The Caller ID claims apply to all numbers regardless of type, and there is a cause of action for their violation. ........................................................................................ 10

    C.    Plaintiff adequately pleads vicarious liability. ................................................. 14

    D.    Venue is proper because both Defendants are subject to jurisdiction here and have offices here. 25

**VI.    Conclusion** ....................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, 2018 U.S. Dist. LEXIS 132078 (N.D. Cal. 2018) ........................................................................................................ 24

*Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817 (N.D. Ill. 2016) ............... 22, 23, 24

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................. 3, 5

*Bank v. Indep. Energy Grp. LLC*, No. 12-CV-1369, 2014 WL 4954618 (E.D.N.Y. Oct. 2, 2014) ........................................................................................................ 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 3, 4

*Bowen v. Georgetown Univ. Hosp*, 488 U.S. 204 (1988) ................................................ 13

*Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988) ...................................... 14, 22

*Bumpus v. Realogy Brokerage Grp. LLC*, No. 3:19-CV-03309-JD, 2022 WL 867256 (N.D. Cal. Mar. 23, 2022) ............................................................................................... 19

*Callier v. Nat'l United Grp., LLC*, No. EP-21-CV-71-DB, 2022 WL 4088205 (W.D. Tex. Sept. 6, 2022) ............................................................................................... 16

*Chennette v. Porch.com, Inc.*, 50 F.4th 1217 (9th Cir. 2022) ...................................... 9

*Chinitz v. Intero Real Est. Servs.*, No. 18-CV-05623-BLF, 2021 WL 1375837 (N.D. Cal. Apr. 12, 2021) ......................................................................................................................... 19

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019) ....................................................... 14

*Cunningham v. Cap. Advance Sols., LLC*, No. 17-13050 (FLW), 2018 U.S. Dist. LEXIS 197590 (D.N.J. Nov. 20, 2018) ........................................................................................................... 14

*Cunningham v. Rapid Response Monit. Servs.*, 251 F. Supp. 3d 1187 (M.D. Tenn. 2017) ......... 15

*Cunningham v. Wallace & Graham*, No. 1:24-CV-00221, 2024 WL 4826798 (M.D.N.C. Nov. 19, 2024) ............................................................................................................................ 18

*Dickson v. Direct Energy, LP*, No. 5:18-CV-00182-JRA, 2024 WL 4416856 (N.D. Ohio Oct. 4, 2024) ....................................................................................................................................... 25

*Dobronski v. CHW Grp.*, No. 24-cv-11649, 2025 WL 2426370 (E.D. Mich. Aug. 21, 2025) ..... 12

*Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373 (E.D. Mich. 2025) ..................... 12, 13

*Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988 (N.D. Ill. 2016) ..................................... 15

*Doyle v. JTT Funding, Inc.*, No. LACV1806145JAKASX, 2019 WL 13037025 (C.D. Cal. Dec. 2, 2019) ...................................................................................................................................... 5

*Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006) ................... 6, 7

*Goel v. Bunge, Ltd.*, 820 F.3d 554 (2d Cir. 2016) .......................................................................... 8

*Harrington v. Roundpoint Mortg. Servicing Corp.*, 2017 U.S. Dist. LEXIS 55023 (M.D. Fla. Apr. 10, 2017) .......................................................................................................................... 20

*Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068 (9th Cir. 2019) ............................. 23

*Hodgin v. Parker Waichman Llp*, No. 3:14-CV-733-DJH, 2015 WL 13022289 (W.D. Ky. Sept. 30, 2015) .................................................................................................................................... 5

*Hossfeld v. DIRECTV, LLC*, No. 222CV05339JLSMAA, 2023 WL 3549742 (C.D. Cal. Mar. 31, 2023) ....................................................................................................................................... 25

*Hulett v Eyebuydirect, Inc.*, No. 1:24-CV-996 (AMN/MJK), 2025 WL 1677071 (N.D.N.Y. June 13, 2025). ................................................................................................................................. 8

*In re DISH Network*, 28 FCC Rcd. 6592-93 ..................................................................... 15, 24, 25

*In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141 (D. Idaho 2011) ........... 22

*In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 (2003) ................................................................................................................ 9, 12

*Jones v. Century Oil U.S.A., Inc.,* 957 F.2d 84 (3d Cir. 1992) ................................................ 22, 25

*Keim v. ADF Midatlantic, LLC,* 2015 WL 11713593 (S.D. Fl. 2015) ........................................ 24

*Klein v. Just Energy Grp., Inc*., No. CV 14-1050, 2016 WL 3539137 (W.D. Pa. June 29, 2016)14

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015)..................................................... 5

*Mauer v. Am. Intercontinental Univ., Inc.*, 2016 U.S. Dist. LEXIS 120451 (N.D. Ill. Sep. 7, 2016) ................................................................................................................... 15

*McMorrow v. Core Properties, LLC*, No. 4:23-CV-00126-JAR, 2023 WL 8697795 (E.D. Mo. Dec. 15, 2023).................................................................................................... 19, 25

*Meyer v. Holley*, 537 U.S. 280 (2003) ...................................................................................... 19

*Newell v. JR Cap., LLC*, --- F. Supp. 3d ---, 2025 WL 2004706 (E.D. Pa. July 16, 2025) .......... 12

*Phillips v. Mozes, Inc.*, No. 2:12-CV-04033-JEO, 2014 WL 12589671 (N.D. Ala. Sept. 3, 2014)5

*Radvansky v. Kendo Holdings, Inc.*, 744 F. Supp. 3d 1314 (N.D. Ga. 2024)............................. 13

*Ross v. Blake*, 578 U.S. 632 (2016) ........................................................................................... 4

*Sasin v. Enter. Fin. Grp., Inc.*, No. CV 17-4022-CBM-RAO, 2017 WL 10574367 (C.D. Cal. Nov. 21, 2017) .................................................................................................... 5

*Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485 (E.D. Pa. Mar. 14, 2025) ................................................................................................................... 10

*Shelton v. Target Advance LLC*, No. CV 18-2070, 2019 WL 1641353 (E.D. Pa. Apr. 16, 2019). ........................................................................................................................ 10

*Sims v. Artuz*, 230 F.3d 14 (2d Cir. 2000)................................................................................. 7

*Tsolumba v. SelectQuote Ins. Servs.*, No. 5:22-CV-00712, 2023 WL 6146644 (N.D. Ohio Sept. 20, 2023) ................................................................................................................. 5

*United States v. Dish Network LLC*, 256 F. Supp. 3d 810 (C.D. Ill. 2017)........................... 15, 20

*Zeno v. Ford Motor Co.*, 480 F. Supp. 2d 825 (W.D. Pa. 2007) ................................................ 14

**Statutes**

15 U.S.C. § 6153 ............................................................................................ 12, 13

18 U.S.C. § 922 .................................................................................................... 7

47 C.F.R. § 64.1200 ................................................................................... 3, 11, 14

47 C.F.R. § 64.1601 ...................................................................................... passim

47 C.F.R. § 64.2305 ............................................................................................. 4

47 U.S.C. § 153 .................................................................................................. 11

47 U.S.C. § 227(c)(1)(A-E) ................................................................................. 4

47 U.S.C. § 227(c)(2) .......................................................................................... 4

47 U.S.C. § 227(c)(3) ................................................................................. 4, 12, 13

FED. R. CIV. P. 12(b)(6) ...................................................................................... 3

FED. R. CIV. P. 8 ................................................................................................. 3

**Other Authorities**

*FCC Report and Order*, 18 FCC Rcd. 14014 (2003) ......................................... 5

Restatement (Third) of Agency ................................................................ 19, 20, 21

## II.    INTRODUCTION

Delancey Street's motion is just a repackaging of arguments that other courts have already rejected. It seeks dismissal based on a distorted characterization of Plaintiff's telephone number and in the face of the Plaintiff's own pleading, a refusal to acknowledge agency principles deeply rooted in TCPA jurisprudence, and other arguments that are contrary to the law and to Delancey Street's own business activities. As numerous other courts have held, those efforts to avoid liability, sounding in strained factual narratives and narrow legal theories, should be rejected. As the Plaintiff's Declaration makes clear, the telephone number at issue in this litigation is a personal, non-commercial, residential cellular line, which has been on the National Do Not Call Registry since 2003. The number at issue briefly appeared on a business website because of a technical error and not because Plaintiff uses the number for business purposes. This Court should permit the Plaintiff's claims to proceed to discovery, where Plaintiff will prove that his number is and was at all times relevant eligible for registration on the National Do Not Call Registry. Even assuming, *arguendo*, that Defendant met its burden of demonstrating business use of the Plaintiff's number at the pleadings stage (it has not), Plaintiff still has claims for violations of the TCPA's caller ID regulations contained in 47 C.F.R. § 64.1601(e). And, as other courts have held, the question of vicarious liability is a fact intensive one inappropriate for adjudication at the pleadings stage. Defendant's motion should therefore be denied in its entirety.

## III.    FACTUAL BACKGROUND

Plaintiff David Tom is a private individual and consumer whose personal cellular telephone number, 321-XXX-XXXX, has been registered on the National Do Not Call Registry since June 2003. (Am. Compl. ¶ 19, 26). The number is assigned and billed in Plaintiff's personal name and is assigned to a consumer wireless service, not to a telephone exchange service for businesses. (Am. Compl. ¶ 21, 22). Plaintiff does not hold this number out to the

public as a business line. To the contrary, he has two toll-free numbers he uses as the telephone numbers for his firearms business, Tom & Company, d/b/a Going Quiet. The 321-number on which Plaintiff received calls and which is listed in the Complaint appears in ATF databases only because he listed it as a personal number, as required by ATF, and not for use in the course of his business. (Am. Compl. ¶ 24). Put simply, Plaintiff does not use the number "in the regular course of trade or for the principal objective of livelihood or profit," as required by law. (Am. Compl. ¶ 24). As such, the Plaintiff has pled that his telephone number is residential. (Am. Compl. ¶ 19).

Despite Plaintiff's registration on the National Do Not Call Registry and his prior opt-out request to Delancey Street in 2022, (Am. Compl. ¶ 28), Plaintiff received over eight unsolicited telemarketing text messages from Defendant MJA Holdings, acting under the fictitious name "MCA Justice," beginning in March 2025. (Am. Compl. ¶ 29). Those messages were sent to encourage the purchase of Delancey Street's services and went so far as to identify themselves as coming from Delancey Street in emails, another hallmark of agency. (Am. Compl. ¶ 38, 39). These messages also failed to transmit accurate or required caller identification information. Instead of transmitting Delancey Street's or MJA's name, the CNAM displayed only a geographic location such as "BABYLON NY," even though their carrier Bandwidth made accurate CNAM functionality available. (Am. Compl. ¶ 30-32). Plaintiff replied to the messages and requested they stop, but received further texts in violation of his request. (Am. Compl. ¶ 37).

The Amended Complaint further alleges that MJA acted as Delancey Street's agent in conducting this campaign, and that Delancey Street exercised control and reaped the benefits of MJA's telemarketing, including through commission sharing and residual payments. (Am. Compl. ¶ 36, 41-47, 55-67). Delancey Street reserved rights to review client eligibility, obtain call records, and terminate MJA for unlawful conduct, while simultaneously continuing to profit

from and ratify MJA's actions. (Am. Compl. ¶ 57-60, 62-67). From the consumer's perspective, MJA held itself out as Delancey's "firm," with apparent authority to enrol clients, schedule onboarding calls with Delancey negotiators, and present itself in emails as Delancey. (Am. Compl. ¶ 41-42, 69-70). Venue is proper in this District because Delancey Street is a corporation with its registered office in Albany, and both Defendants are residents of the State of New York for personal jurisdiction purposes. (Am. Compl. ¶ 5-9).

On July 14, 2025, Plaintiff filed his Amended Complaint asserting claims under the TCPA's Do Not Call provisions, 47 C.F.R. § 64.1200, and Caller ID transmission rules, 47 C.F.R. § 64.1601(e). Defendant thereafter filed its Motion to Dismiss on August 8, 2025. This response follows.

## IV.    LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a "short and plain statement" of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests, not detailed factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 678 (cleaned up).

In determining whether a claim is plausible, the court must "draw on its experience and common sense." *Id.* at 678. After identifying elements to set forth a claim and removing conclusory allegations, the Court must accept all well-pled factual allegations as true and

determine if they give rise to relief. *Id.* A complaint may be dismissed only where it appears that there are not "enough facts to state a claim that is plausible on its face," not merely because the defendant proffers some contrary facts. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## V.   ARGUMENT

*A.    Mr. Tom is a "residential telephone subscriber" under the TCPA.*

The crux of Delancey Street's motion argues that Mr. Tom is not a "residential telephone subscriber" under the TCPA's regulations. Not so.

How does the FCC, the agency charged with implementing rules for Do Not Call Registry,[1] define "residential subscriber" as opposed to "business subscriber?" Quite simply. As with any question of statutory interpretation, the court's inquiry "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). And, under the TCPA, a "residential subscriber refers to a subscriber to telephone exchange service that is not a business subscriber" and a business subscriber is a "subscriber to telephone exchange service for businesses." 47 C.F.R. § 64.2305(b), (d). This language excludes only one type of service–telephone exchange services for businesses–from the protections afforded by the DNC. The fact the regulation contains only one exclusion demonstrates that the regulation errs on the side of being overinclusive, not underinclusive. And Mr. Tom has pled and confirmed in his Declaration that he is a subscriber to a telephone exchange service for consumers, not one for businesses. (Am. Compl. ¶ 18-22, 26); (Tom Dec. ¶ 24). Nor does he use the number for "livelihood or profit" as required by law.

What's more, the FCC has adopted enhanced protective standards for cellular telephone numbers. To this end, the FCC has established a presumption that "wireless subscribers who ask

---

[1] The Federal Communication Commission ("FCC") possesses authority to issue implementing rules and regulations for the TCPA. *See* 47 U.S.C. § 227(c)(1)(A-E) and (c)(2) and (c)(3). Pursuant to that authority, the FCC promulgated regulations relating to the implementation, interpretation of the TCPA. *See* 47 C.F.R. § 64.1200(a)-(m).

to be put on the national do-not-call list *are residential subscribers*." *FCC Report and Order*, 18

FCC Rcd. 14014, 14039 (2003) (cleaned up) (emphasis added). This is so, *even if they also use*

*such numbers partially for business purposes.* Indeed, the Fourth Circuit in *Krakauer v. Dish*

*Network, L.L.C*, 925 F.3d 643, 657 (4th Cir. 2019), concluded the TCPA's language was clear

and that numbers on the Do Not Call Registry, by virtue of their mere registration, are

*presumptively residential*. Courts nationwide have agreed. *See, e.g.*, *Tsolumba v. SelectQuote*

*Ins. Servs.*, No. 5:22-CV-00712, 2023 WL 6146644, at *5 n.3 (N.D. Ohio Sept. 20, 2023) ("This

Court therefore joins the majority of courts throughout the country who have held that cell

phones like [plaintiff's] are entitled to the TCPA's protection as residential telephones."); *Sasin*

*v. Enter. Fin. Grp., Inc.*, No. CV 17-4022-CBM-RAO, 2017 WL 10574367, at *5 (C.D. Cal.

Nov. 21, 2017) (denying MTD for personal cell on DNC); *Hodgin v. Parker Waichman Llp*, No.

3:14-CV-733-DJH, 2015 WL 13022289, at *3 (W.D. Ky. Sept. 30, 2015) (same); *Phillips v.*

*Mozes, Inc.*, No. 2:12-CV-04033-JEO, 2014 WL 12589671, at *6 (N.D. Ala. Sept. 3, 2014)

(holding that allegation that cell phone was registered on DNC created reasonable inference of

residential use); *Doyle v. JTT Funding, Inc.*, No. LACV1806145JAKASX, 2019 WL 13037025,

at *8 (C.D. Cal. Dec. 2, 2019) (judgment for plaintiff).

On a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded

allegations in the complaint as true and draw all reasonable inferences in Plaintiff's favor.

*Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015). The issue is not whether

Plaintiff will ultimately prevail, but whether his complaint "contain[s] sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. 662,

663. In making this determination, courts in the Second Circuit generally limit their review on a

12(b)(6) motion to the facts alleged in the complaint, documents attached to the complaint as

exhibits, and documents incorporated by reference." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155-156 (2d Cir. 2006). Reliance on extrinsic materials, such as inaccurate third-party websites purporting to database and catalog federal firearms licensees, cut outs from spreadsheets, and website errors, is impermissible unless the Court converts the motion to one for summary judgment, which Defendant has not sought. *Id.*

Here, the Complaint alleges in detail, and Plaintiff's declaration confirms, that Plaintiff's 321-number is a personal, residential cellular number subscribed in his name, billed to a consumer on that plan, and registered on the National Do Not Call Registry since 2003. It has been his cellular number since that time. Moreover, the Plaintiff's declaration also explains both why his 321- number came to be included in some ATF databases on which the Defendant relies in its motion, as well as erroneously on the Plaintiff's website, because a third party vendor added it at some point by in error, not because Plaintiff placed his number on the website at any time relevant to the Complaint. The Declaration further makes clear that Plaintiff does not hold this number out as a business line and that he instead uses two toll-free numbers for his firearms business. The 321-number only appears in ATF databases because Plaintiff was required to list a personal contact number. Those sworn allegations must be accepted as true at this stage.

Defendant's effort to contradict these pleaded facts with extrinsic evidence, that the Plaintiff has nevertheless explained any inconsistency contained therein, is improper. Defendant argues that Plaintiff's number is a business line because it appears in certain extrinsic evidence. But whether a number is "residential" for purposes of the TCPA is a fact-intensive question not resolvable on a motion to dismiss. The Complaint pleads, and Mr. Tom's declaration confirms, that he uses the number for residential purposes, and further that it is not used "in the regular course of trade or for the principal objective of livelihood or profit," language which tracks the

regulatory "hook" for the business of a federal firearms licensee. 18 U.S.C. § 922(a)(1)(A). And without that regulatory hook, the Plaintiff cannot use the number for business purposes without violating federal law. At this stage, the Court must credit those allegations. The Second Circuit has made clear that a court errs when it considers extrinsic evidence and other matters submitted by defendants not embraced by the pleadings in ruling on a 12(b)(6) motion to dismiss without first converting the motion into one for summary judgment. *Glob. Network*, 458 F.3d at 154-157.

Even to the extent that the materials submitted by Delancey Street are permissibly considered on a Rule 12(b)(6) motion (they are not), the Plaintiff's pleading and Declaration raise factual disputes as to the Plaintiff's use of the number that cannot be resolved now. As an initial matter, the extrinsic evidence and materials submitted bear indicia of unreliability. For example, Going Quiet is a Type 7 FFL, which is a manufacturer of firearms, other than destructive devices. (Tom Dec. ¶ 8, 9). However, Exhibit F to Defendant's motion and Defendant's motion itself states that Going Quiet is a "Dealer in Firearms," which is inaccurate. (ECF No. 10, p. 16). Moreover, it appears that the "required business contact" is simply ATF's database record for the personal number necessary for exigent circumstances, as Mr. Tom's declaration explains. (Tom Dec. ¶ 8, 9). Given that the Plaintiff has in fact explained the Defendant's extrinsic evidence, although he is not required to, the Court should deny the motion.

A defendant cannot use disputed and explained extrinsic evidence as a vehicle for testing the factual accuracy of a complaint. *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("Our task in reviewing a 12(b)(6) ruling is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") Indeed, because "a motion brought under Rule 12(b)(6) challenges only the "legal feasibility" of a complaint," to the extent that extrinsic evidence tests the claim's "substantive merits," that is reserved for

"summary judgment;" Rule 12(b)(6) limits the Court to reviewing only a "narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558–59 (2d Cir. 2016) (citing *Glob.* and reversing the district court's reliance on extrinsic evidence that was neither incorporated by reference nor integral to the complaint). Defendant's extrinsic evidence is the same type of evidence the district court relied on and which the Second Circuit in *Goel* held to be impermissible.

Defendant further seems to contend that ever using a telephone number, at any point, for any business purpose whatsoever, confers an indelible mark on that telephone number rendering it permanently ineligible for inclusion on the National Do Not Call Registry. Not only does that proposition find no support in the law, but such a standard would essentially render no phone number eligible for inclusion on the Do Not Call Registry, as doubtlessly counsel for the Defendant, this Court, and its hardworking staff have occasionally taken Court-related calls on their personal cell phones. Thus, Mr. Tom's prior business use of his number many years ago does nor confer an indelible mark on its character, and Mr. Tom has stated a claim.

Nor is Defendant's argument that its failure to honor the Plaintiff's internal Do Not Call request was "reasonable" at all availing, either. This case is nothing like *Barr*, nor is it like *Hulett v Eyebuydirect, Inc.*, where it was alleged that the defendant's failure to immediately honor an internal do not call request was reasonable because the message was "though an automated system." No. 1:24-CV-996 (AMN/MJK), 2025 WL 1677071, at *7 (N.D.N.Y. June 13, 2025). Indeed, the *Hulett* court cited to *Barr* in noting the statutory language that the requirement imposes that the request be honored in a "reasonable" period. *Id.* The inquiry is "often best left to a jury." *Id.* But when there was no evidence that the automated system there created some unreasonable delay, this Court dismissed the case. The facts of the text messages here are manifestly *unreasonable*: unlike in *Hulett*, the Plaintiff was speaking with a human, not an

automated system, and made that fact crystal clear by saying "Don't text me," to which "John," in plain disregard of the Plaintiff's instructions, immediately texted back and continued to text practically every day thereafter. An automated system may be expected to continue to text someone for a short time after they remove themselves, especially if such messages are programmed in advance. It is manifestly unreasonable for a human reading a message that says "Don't text me" to immediately proceed to do what the message says not to do.

Setting aside the evidentiary defects with Defendant's extrinsic evidence, the (at best, disputed) factual allegations and averments in the Amended Complaint and Declaration establish a plausible claim under the TCPA's residential protections and underscore the need to take discovery on Plaintiff's use of the number and associated timeline(s) under which his number was solely business, solely residential, or mixed use, and the degree of the mixed use. Section 227(c)(5) of the TCPA provides a private right of action to "*A person* who has received more than one telephone call within any 12-month period." The FCC's regulations make clear that wireless subscribers may register on the National Do Not Call Registry and are to be treated the same as residential wireline subscribers. *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14037 (2003). The Ninth Circuit has recognized that registration of a cell phone on the National Do Not Call Registry is dispositive of residential status, particularly for pleading purposes, as such numbers are "presumptively residential." *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1225 (9th Cir. 2022). A defendant like Delancey Street may, of course, overcome that presumption through evidence adduced in discovery. *Id.*

Defendant's own authorities confirm this point. As Defendant concedes, the "evidence" that "a cell phone line is used only or primarily as a business line" is a basis to grant "summary judgment to the defendants." (ECF No. 10, p. 15). But all the authorities cited by the Defendant,

including *Smith*, *Mattson*, *Bank*, and *Shelton* all reached that conclusion *at summary judgment*. Indeed, the Eastern District of New York in *Bank* initially *denied* defendant's motion to dismiss because the court did not have "sufficient evidence before [it] to determine whether the telephone line at issue is 'residential.'" *Bank v. Indep. Energy Grp. LLC*, No. 12-CV-1369, 2014 WL 4954618, at *1 (E.D.N.Y. Oct. 2, 2014). And in *Shelton*, the court considered at summary judgment similar evidence to *Bank* that the "held the Phone Number out to the world as a business phone number." *Shelton v. Target Advance LLC*, No. CV 18-2070, 2019 WL 1641353, at *6 (E.D. Pa. Apr. 16, 2019). That is not the case here, particularly given the unreliability of the Defendant's own extrinsic evidence, which makes such an egregious error as mischaracterizing Going Quiet as a "dealer in firearms" when it is in fact a "manufacturer." In fact, the *Shelton* court later held, with respect to the same phone number and plaintiff, that the plaintiff did state a claim once he ceased using his number for business purposes. *Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485, at *4, *5 (E.D. Pa. Mar. 14, 2025). This motion should be denied outright or at minimum the question of the use of the number reserved for trial.

B.    *The Caller ID claims apply to all numbers regardless of type, and there is a cause of action for their violation.*

Even assuming, *arguendo*, that the plaintiff had no cause of action for his do not call claims because his number was a business number, his caller ID claims remain, since the text of the caller ID rule itself confirms that it applies based on the caller's conduct, not the type of number called, and explicitly imputes any wrongful conduct onto the ultimate seller, like Delancey Street, not just the telemarketer, MJA. The regulation provides that "[a]ny person or entity that engages in telemarketing . . . must transmit caller identification information," including a CPN or ANI and, when available from the telemarketer's carrier, the telemarketer's name. 47 C.F.R. § 64.1601(e)(1). And the regulations further define "telemarketing" as "the

initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(13). The term "person" includes an individual, partnership, association, joint-stock company, trust, or corporation. 47 U.S.C. § 153(39).

The statutory text defeats both of Delancey Street's arguments. First, the applicable text makes clear that the prohibition applies to "any entity" that engages in "telemarketing," that is, a call made for the purpose of encouraging the purchase of services to any person. The use of "any person" is contrasted with the DNC regulation's requirement that the calls be placed to a "residential subscriber." Thus, even a business can sue for violation of the caller ID provision. Moreover, the text of the provision itself is written in such a way that it expressly imputes liability on entities whose goods and services are promoted on the call when they use telemarketers like MJA. It provides such entities two alternative options: either transmit the telemarketer's caller ID name (i.e. transmit MJA's name), or transmit the seller's name (i.e. transmit Delancey Street's name). § 64.1601(e). There is no third option.

That structure is by design: the caller ID rule targets the telemarketer's (or ultimate company's) duty to reveal itself on all telemarketing calls, ensuring transparency across the board. As Defendant itself summarizes the rule, § 64.1601(e)(1) "prohibits telemarketers from appearing on telephone subscribers' Caller IDs as 'unknown' by requiring them to transmit" the enumerated caller ID information. (ECF No. 10, p. 25). The operative language *directly* regulates the conduct of telemarketers *and the companies that hire them* by requiring transmission of either name, rendering vicarious liability inapplicable. It also does not carve out (or condition liability upon) the called party's classification, as contrasted to the Do Not Call rules, either.

Second, there is a growing body of authority holding that there exists a private right of

11

action to enforce violations of the caller ID rule, which further points out the errors adopted by

the authorities cited by the Defendant. *E.g.*, *Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d

373, 376-380 (E.D. Mich. 2025); *Newell v. JR Cap., LLC*, --- F. Supp. 3d ---, 2025 WL 2004706,

at *2 (E.D. Pa. July 16, 2025); *Dobronski v. CHW Grp.*, No. 24-cv-11649, 2025 WL 2426370, at

*7-*8 (E.D. Mich. Aug. 21, 2025). The agency record shows the FCC promulgated § 64.1601(e)

under its § 227(c) authority, the subsection that both protects privacy and carries the private right

of action in § 227(c)(5). A review of the appropriate legislative history confirms that the instant

regulation here was promulgated in 2003 under rulemaking Congress explicitly authorized when

it passed the Do Not Call Implementation Act of 2003, 15 U.S.C. § 6153 ("2003 Act"), which

related to *privacy*, the mainstay of Section 227(c). Pursuant to that mandate, the FCC began a

rulemaking proceeding that expressly sought comment on whether "network technologies have

been developed over the last decade," and which ultimately resulted in an order promulgating the

implementation and incorporation of the instant caller ID legislative rule, as well as Do Not Call

Registry rules. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*

("2003 TCPA Order"), CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14118.

As the FCC explained in that 2003 TCPA Order rulemaking proceeding, "The new rules will

also require all companies conducting telemarketing to transmit caller identification (caller ID)

information, when available, and prohibits them from blocking such information." *Id.* at 14017.

 Nor does the case law hold otherwise. All the other cases, save for one, cited by

Defendant, are other Michigan district court cases that were subsequently reversed in *Dobronski*.

And *Travel Options* did not reach the conclusion that there was no right of action independently;

rather, this case relied on faulty and underdeveloped reasoning in other cases, which themselves

did not engage in extensive analysis. As the *Dobronski* Court explained:

In *Travel Options*, the court determined that § 64.1601(e) was promulgated to enforce § 227(d), which lacks a private right of action, because § 64.1601(e)'s caller ID requirement resembles "technical and procedural standards." In doing so, the court noted that the outcome was "not clear." To be sure, § 227(d) is titled "Technical and Procedural Standards," and it is not unreasonable to think that caller ID is "technical" or "procedural." But slotting § 64.1601(e) into § 227(d) on that basis is a little odd, given that § 64.1601(e) focuses on caller ID requirements for all telemarketing calls, and § 227(d) by its own terms governs only fax machines, automatic telephone dialing systems, and artificial or prerecorded voice systems. . . . By contrast, § 227(c) focuses on privacy rights generally and also spoke in terms of "methods and procedures" as well as "telephone network technologies" as mechanisms to protect subscriber privacy rights. . . . But it does not follow that the FCC could not promulgate technology-focused rules (like a caller-ID requirement) under § 227(c)'s "telephone network technologies" language merely because it could also protect subscriber privacy rights in other, non-technological ways. . . . And it is not intuitive why the fact that a rule directly supports § 227(c)'s goals by employing a network technology and "will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers" bolsters the notion that § 64.1601(e) was not promulgated under the statute's subsection focused on protecting privacy rights. The Court sees no textual basis to carve from regulations that "protect" privacy rights those that merely "support" consumers' ability to enforce their rights—i.e., privacy rights are protected in part because wrongdoers are prohibited from hiding behind anonymity. At bottom, subsection 227(c) lets the FCC make rules to protect privacy rights and lets consumers sue when telemarketers violate those rules; § 64.1601(e) is a rule that helps protect privacy rights. *Travel Options's* influential inference seems to run uphill. . . . The other cases add little because they largely rely on *Travel Options* or on each other. . . . Those cases provided little analysis beyond that performed in *Travel Options*.

*Dobronski*, 2025 WL 900439, at *4–*5.

In any event, the fact remains that the FCC stated that it promulgated the instant caller

ID regulations at 47 C.F.R. § 64.1601(e) pursuant to authority Congress gave it in 15 U.S.C. §

6153, which authorized the FCC to promulgate the instant regulation "under" the TCPA at

227(c). *See Bowen v. Georgetown Univ. Hosp*, 488 U.S. 204, 208 (1988). "[T]he 2003 FCC

[TCPA O]rder applies to section 227(c). . . .Therefore, Radvansky may bring a case." *Radvansky

v. Kendo Holdings, Inc.*, 744 F. Supp. 3d 1314, 1321, 1321 n.3, n.4 (N.D. Ga. 2024). The *only*

authority "under" which the FCC could promulgate regulations "under the [TCPA]" that

supports the Congressional mandate is § 227(c), which provides for the instant private right of

action to "protect residential subscribers' privacy rights to avoid receiving telephone solicitations

to which they object." The FCC said so itself, confirming it was doing so pursuant to § 227(c).

*See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019) (citing 47 C.F.R. § 64.1200(c)(2) and explaining that it was created pursuant to regulations promulgated by the FCC under Section 227(c)). There is simply no other statutory subsection "under the TCPA" upon which Congress could direct the FCC to promulgate the Caller ID regulations it ordered the FCC implement (including to align with the FTC), the entire purpose of which is to permit call recipients to *lodge their objections against unsolicited telemarketing calls*. There exists a private right of action for violations of 47 C.F.R. § 64.1601(e) (as with 64.1200(c) and (d)), as Congress intended under 47 U.S.C. 227(c)(5). As the growing body of case law counsels, the Plaintiff's claims in this regard are actionable and should not be dismissed.

C.     *Plaintiff adequately pleads vicarious liability.*

Delancey Street is vicariously liable for MJA's telemarketing under theories of actual authority, apparent authority, and ratification. "[A] party may be liable under the TCPA in accordance with tort-related vicarious liability rules," including actual authority, apparent authority, and ratification principles. *Klein v. Just Energy Grp., Inc*., No. CV 14-1050, 2016 WL 3539137, at *9 (W.D. Pa. June 29, 2016). A TCPA plaintiff is required to allege a sufficient basis for any "one of the common law agency theories." *Cunningham v. Cap. Advance Sols., LLC*, No. 17-13050 (FLW), 2018 U.S. Dist. LEXIS 197590, at *17-21 (D.N.J. Nov. 20, 2018). The existence of an agency relationship is normally one for the trier of fact to decide. *Zeno v. Ford Motor Co.*, 480 F. Supp. 2d 825, 846 (W.D. Pa. 2007). Nor is the contract's language dispositive, as the Second Circuit has observed that a written contract is not determinative of the matter, for it is the actual practice between the parties that is crucial. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) (looking to totality of circumstances to determine if entity was an employee or contractor). Labelling in a contract cannot negate other parts of the contract or the parties' course of dealing; agency turns on actual practice.

14

For this reason, "[a] plaintiff is not required to plead all of its evidence in the complaint in order to plausibly allege agency." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 996 (N.D. Ill. 2016). A plaintiff must only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Mauer v. Am. Intercontinental Univ., Inc.*, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sep. 7, 2016). And a 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of [agency] relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Thus, for a TCPA claim, a plaintiff sufficiently pleads that a defendant directed an agent's calls by alleging facts giving rise to an inference that the defendant was "involved" in the "sales practices and marketing procedures." *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 922-923 (C.D. Ill. 2017); *Dolemba*, 213 F. Supp. 3d at 997 ("Of course, these facts may not be sufficient to prove any theory of vicarious liability. They are more than sufficient, however, to entitle Dolemba to further discovery.").

For TCPA claims specifically, there is a low bar to pleading vicarious liability, as a plaintiff is *not expected* to allege "facts suggesting that" the defendant: (1) "instructed" the putative agent "to make the call to" the plaintiff, (2) "had any authority over the time, means and manner of" the putative agent's solicitations, or (3) "had the ability to issue instructions … on these subjects." *Dolemba*, 213 F. Supp. 3d at 997 ("But Farmers does not suggest how Dolemba could reasonably be expected to know those facts at this stage in the litigation. Indeed, it is likely that all of the documents and information that establish (or refute) the details of the agency relationship between Farmers and the Lombardi Agency are exclusively within the Defendants' custody and control."); *see Cunningham v. Rapid Response Monit. Servs.*, 251 F. Supp. 3d 1187, 1199 (M.D. Tenn. 2017) ("Cunningham has investigated the parties extensively, but inevitably

some aspects of their relationships will only come to light in discovery.").

These vicarious liability principles apply to a company who participated in or authorized another entity, like MJA, to perform the violative conduct, even when the seller did not directly commit the violative conduct or even place the calls at issue. *E.g.*, *Callier v. Nat'l United Grp., LLC*, No. EP-21-CV-71-DB, 2022 WL 4088205, at *6–7 (W.D. Tex. Sept. 6, 2022) (imposing vicarious personal liability on an individual insurance agent who was responsible for writing an insurance policy based on an illegal call initiated by an unrelated, unnamed caller). And here, the Plaintiff has pled sufficient facts to infer an agency relationship, or at the very least, facts sufficient to permit discovery into any vicarious liability issues. Those allegations are based, in large part, on the contract the Defendant itself has attached to its motion, as well as the very experience of the Plaintiff himself. The Plaintiff's Amended Complaint contains various allegations, all of which demonstrate the hallmarks of an agency relationship, control, under any one of these three generally-accepted theories. The agency relationship between MJA and Delancey Street was memorialized in a lead generation agreement that contained many of the hallmarks of an agency relationship. Some of those requirements, and demonstration of how they show control, are reproduced below:

| Quote From ISO Agreement | How Control is Demonstrated |
|---|---|
| The ISO shall: (a) Identify and qualify prospective clients who can benefit from the Company's services. (b) Refer prospective clients to the Company by providing accurate and relevant data required for enrollment. (c) Enroll eligible clients into the debt settlement program, ensuring they meet the Company's criteria. (d) Schedule the client's initial payment into the program. (e) Arrange an onboarding call with the assigned negotiator. (f) Maintain strict | Delancey dictates the eligibility standard ("Company's criteria"), the timing of customers' first payments, and requires onboarding with a Delancey negotiator. It binds MJA to Delancey "company policies" and reserves audit access to the ISO's call recordings on demand, which represents direct, hands-on control of the very telemarketing pipeline at issue in this litigation. MJA must supply enrolment-grade data to Delancey's requirements. Eligibility turns on Delancey's rules it set; MJA executes under those rules. MJA then ushers prospects directly into |

16

| | |
|---|---|
| compliance with company policies. We require the capability to promptly retrieve a call from the ISO's CRM whenever a client raises a complaint or makes any claims of misrepresentation. | Delancey's operations ("assigned negotiator"), creating manifestations of apparent authority. Delancey delegates payment tasks to MJA within Delancey's program, which gives MJA control over the finances for the customers it generated for Delancey. |
| The Company shall: (a) Review and assess the eligibility of clients referred by the ISO. (b) Manage all aspects of the client relationship, including customer service, negotiations, settlements, and payment processing. (c) Provide the ISO with monthly reports… (d) Give the ISO exclusive right of first refusal for any file requiring a switch to a credit card processor. | Delancey is the gatekeeper over who gets enrolled and who is eligible, controls "all aspects" of the client relationship, client service and payments, and coordinates its clients' credit card processing services, even dictating processor changes while giving MJA the right of first refusal. These are classic indicia of control over means and ends of the customer relationship. Delancey controls its customers' credit card processing choices while coordinating with MJA to give MJA a sweetheart deal on the merchant/credit card processing side of the transaction, which further integrates the two entities' businesses and respective abilities and strengths. |
| The Company will issue commission payments to the ISO on a weekly basis. With each weekly payment, the Company shall provide an itemized weekly report identifying each Client, the Client Payment amounts received, and the ISO's corresponding commission. The ISO's right to receive commissions… shall survive the termination of this Agreement. The Company shall continue to pay commissions for all Client Payments received post-termination. | Delancey tied MJA's weekly pay to its performance and Delancey's own accounting, including providing for monitoring and course-corrections for bad deals, and ensures that MJA will continue to be paid, even if it is fired or terminated by Delancey Street. This demonstrates ratification by accepting the fruits of the telemarketing and rewarding MJA, even if such efforts are subsequently illegal or in breach of the agreement. |
| Either Party may terminate this Agreement for any reason, with or without cause, by providing thirty (30) days' prior written notice… and …may terminate… if the other Party materially breaches… and fails to cure within ten (10) days. [U]pon termination… the ISO shall remain entitled to receive any commission payments that accrue from Clients enrolled prior to the termination date, as outlined in Section 3.5. | Termination rights give Delancey the right to stop working with MJA at any time, but while ensuring MJA continues to get paid, even if it did something illegal, thus ratifying MJA's conduct. |
| Each Party shall comply with all | Delancey imposes compliance mandates on MJA's |

| | |
|---|---|
| applicable federal, state, and local laws and MJA shall not engage in any deceptive, unfair, or misleading practices… MJA shall comply with all applicable telemarketing, data privacy, and consumer protection statutes and regulations when identifying, qualifying, and referring prospective Clients. | "identifying, qualifying, and referring" functions, control of the manner and means of solicitation and telemarketing, not merely non-telemarketing aspects of the relationship, demonstrating control. Delancey will continue paying MJA, even if MJA violates, showing ratification. |

Contract, Def's. Exhibit B, ECF 9-2, *passim.*

Specifically, the essence of the agreement was that MJA agreed to deliver prospective clients to Delancey, and Delancey dictated the criteria for the clients it would purchase from MJA. Moreover, Delancey, not MJA, controlled MJA's day-to-day activities by providing criteria for clients it would accept, as well as allowing MJA to accept or reject leads using the criteria it itself directed. The contract contained no geographic limitations, nor otherwise limited MJA's ability to call prospective clients. Besides controlling the geographic targeting of the calling (or, perhaps more accurately, blessing indiscriminate calling), Delancey also controlled the content of MJA's marketing, including by requiring MJA to comply with the TCPA, requiring MJA to avoid "deceptive, unfair, or misleading practices," as well as requiring MJA to abide by Delancey's criteria in conducting its calling.  A litany of other courts has agreed and applied nearly identical reasoning in applying vicarious liability to circumstances similar to those here, where one party's goods are sold through a lead generator sales process. *See, e.g.*, *Cunningham v. Wallace & Graham*, No. 1:24-CV-00221, 2024 WL 4826797, at *3 (M.D.N.C. Nov. 19, 2024) ("The complaint alleges that Sokolove partnered with Wallace & Graham to solicit Camp Lejeune claimants through telemarketing efforts and that Wallace & Graham and Rhine Law Firm were both signatories of the proposed retainer agreement sent to Cunningham after the calls. These allegations, which must be accepted as true, provide a sufficient basis for 'draw[ing] the reasonable inference that the defendant[s] [are] liable for the misconduct

alleged.'"); *Bumpus v. Realogy Brokerage Grp. LLC*, No. 3:19-CV-03309-JD, 2022 WL 867256, at *7 (N.D. Cal. Mar. 23, 2022) (certifying TCPA class against brokerage for actions of purportedly independent agents); *Chinitz v. Intero Real Est. Servs.*, No. 18-CV-05623-BLF, 2021 WL 1375837, at *5 (N.D. Cal. Apr. 12, 2021) ("The Court finds that Defendant is vicariously liable for calls made by its corporate sales associates and agents based on apparent authority."); *McMorrow v. Core Properties, LLC*, No. 4:23-CV-00126-JAR, 2023 WL 8697795, at *13 (E.D. Mo. Dec. 15, 2023) ("[T]he Court finds that Plaintiff has established that Core Properties provided apparent authority to 1000 CAD to send the text messages to Plaintiff."); *Hayhurst v. Keller Williams Realty, Inc.*, No. 1:19CV657, 2020 WL 4208046, at *6 (M.D.N.C. July 22, 2020) ("At this stage of the proceedings, Hayhurst has sufficiently alleged an agency relationship between Keller Williams and the individuals who called him.").

Those facts, including the emails from MJA holding themselves out as Delancey Street, support the exercise of vicarious liability under all three theories. An agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006); see also *Krakauer*, 925 F.3d at 659-660 (stating the same and citing the Restatement). "Once such a relationship is formed, 'traditional vicarious liability rules ordinarily make principals . . . vicariously liable for acts of their agents . . . in the scope of their authority.'" *Id.* at 660 (*quoting Meyer v. Holley*, 537 U.S. 280, 285-86, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003)). "An essential element of agency is the principal's right to control the agent's actions", but this concept of control "embraces a wide spectrum of meanings", including "what the agent shall and shall not do, in specific or general terms." Restatement (Third) of Agency § 1.01 cmt f. "A

principal's control over an agent will as a practical matter be incomplete because no agent is an automaton who mindlessly but perfectly executes commands." *Id.*

**Actual Authority**

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01. Actual authority may be given expressly—such as when the principal states "in very specific or detailed language" how an agent is to act—or impliedly—such as when an agent acts "in a manner in which [the] agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent." *Hayhurst v. Keller Williams Realty, Inc.*, 2020 WL 4208046 at *5 (denying motion to dismiss in TCPA vicarious liability case); see *Cunningham*, 251 F. Supp. 3d at 1199 ("The question of whether implied authority may have existed would require the Court to know more about the course of the parties' dealings and the generally expected course of business ....").

Actual agency "does not require the principal to specify the singular acts for which her or her authority exists as long as the acts are incidental to or reasonably necessary to accomplish what is authorized." *Harrington v. Roundpoint Mortg. Servicing Corp.*, 2017 U.S. Dist. LEXIS 55023, at *21 (M.D. Fla. Apr. 10, 2017). "The concept of scope of authority is broad. An agent has authority to act to further the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives. The principal is liable for the acts of the agent to further the principal's purposes unless the agent acts entirely for the agent's benefit only." *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 923 (C.D. Ill. 2017) (citing

20

Restatement (Third) of Agency § 2.02(1)). Thus, for a TCPA claim, a plaintiff sufficiently pleads that a defendant actual directed an agent's calls by alleging facts giving rise to an *inference* that the defendant was "involved" in the "sales practices and marketing procedures." *United States*, 256 F. Supp. at 922-923; *Dolemba*, 213 F. Supp. 3d at 997 ("Of course, these facts may not be sufficient to prove any theory of vicarious liability. They are more than sufficient, however, to entitle Dolemba to further discovery.").

Delancey Street's own ISO Agreement with MJA demonstrates the requisite control over the enrollment pipeline and the marketing that feeds it. The Agreement further requires weekly commission payments "with an itemized weekly report identifying each Client, the Client Payment amounts received, and the ISO's corresponding commission," and provides that the ISO's right to commissions "shall survive the termination of this Agreement" for clients enrolled before termination. The ISO also benefits by selling its merchant processing services. The Agreement is terminable "for any reason, with or without cause, by providing thirty (30) days' prior written notice," or immediately for cause with a short cure period. These are the hallmarks of control. Delancey dictated who could be enrolled, required onboarding with a "negotiator," tied compensation to Delancey's receipt of "Client Payments," required "strict compliance with company policies," reserved audit-like retrieval of calls from the ISO's CRM, and retained multiple termination levers. That is more than enough to plausibly allege that MJA acted with actual authority to carry out Delancey's sales practices and marketing procedures.

As the Restatement itself cautions, the critical concept of *control* in an agency relationship is not so narrow as to be limited to the express terms of agency in the parties' agreement or even the express scope of authority but extends to encompass direction of "what the agent shall and shall not do, in specific or general terms." Restatement (Third) of Agency §

21

1.01 cmt f.; *Jones v. Century Oil U.S.A., Inc.*, 957 F.2d 84, 87 (3d Cir. 1992). The contract at issue here encompasses many requirements and obligations, outlined above, including those related to the very conduct at issue here, which give rise to the inference of an agency relationship on actual authority. The contract at issue oozes with language reflecting the essential element of control for actual authority. This suffices to establish actual authority. Plaintiff is *not* required to plead that Delancey provided MJA with scripts or expressly stated in "specific or detailed language" how MJA was to act, *Hayhurst*, 2020 WL 4208046 at *7, nor is the language of the contract disclaiming agency dispositive, *Jones*, 957 F.2d at 87; *Brock*, 840 F.2d at 1059.

**Apparent Authority and Ratification**

Apparent authority "arises when a third-party reasonably believes that the [] agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations." *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011). Apparent authority can exist even where a principal does not communicate directly with a consumer. *See Hayhurst*, 2020 WL 4208046 at *8 ("Although Keller Williams is not alleged to have made any statements directly to Hayhurst, it is not required to do so. Rather, its manifestations must be 'traceable' to it even if it did not make them directly to Hayhurst. And, its manifestations 'may take many forms'."). Of course, here, the parties' contract required MJA to transfer client to a Delancey Street employee.

"Ratification occurs when a principal knowingly chooses to accept the benefits of unauthorized actions an agent takes on the principal's behalf." *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016); Restatement (Third) of Agency § 4.01(1) (2006) cmt. d. ("Ratification does not require a pre-existing formal agency relationship."). "[R]atification may create a relationship of agency when none existed between the actor and

the ratifier at the time of the act. It is necessary that the actor have acted or purported to act on behalf of the ratifier." Restatement (Third) of Agency § 4.01 cmt. b; *see Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1075 (9th Cir. 2019) (citing the Restatement and holding in a TCPA action that "ratification may create an agency relationship when none existed before the acts are 'done by an actor … who is not an agent but pretends to be.'"). To demonstrate prospective ratification, a plaintiff must show that a principal had full knowledge of all the facts, *or* was willfully ignorant of those facts, and manifested an intention to ratify the act in question, *or* that an agent acted for a principal's benefit and the principal "fail[ed] to object or repudiate an action." *Henderson*, 918 F.3d at 1074-75; *Aranda*, 179 F. Supp. 3d at 831.

Here, Plaintiff sufficiently pleads Defendant's vicarious liability predicated on apparent authority and ratification theories based on the same allegations supporting an actual authority theory. From the consumer's perspective, MJA held itself out as Delancey, including through the emails outlined in the Amended Complaint. The pleadings allege an email where MJA stated Delancey Street is the company doing the restructuring, encouraged checking Delancey's reviews, and "our attorney," which are manifestations traceable to Delancey and consistent with the contractual role of arranging onboarding and enrollment. It was reasonable for the recipient to believe MJA *was* Delancey, particularly where the emails directed the Plaintiff to Delancey's very own website. Critically, as is evident from the Plaintiff's experiences on the calls, as well as the text of the contract itself, there was a manifestation that the Plaintiff was dealing with "MCA Justice," a "marketing arm" of Delancey. This is sufficient for a holding of apparent authority.

There is also ratification. Delancey accepted and benefitted from the fruits of MJA's telemarketing and agreed to continue paying commissions "post-termination" for all "Client Payments received" on clients MJA had enrolled. A principal that knowingly accepts the benefits

23

of unlawful marketing, despite the right to terminate, and continues to pay on the accounts generated by that marketing, ratifies the conduct. *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 830, 32–33 (N.D. Ill. 2016) ("[T]here is evidence that would support a reasonable finding that each of the three defendants now seeking summary judgment was aware of the call campaign. . . . There is even evidence that all three of these defendants became aware of the possibility that some or all of the calls being made were unlawful under the TCPA and that each of them continued to accept business flowing from the campaign."); Restatement (Third) § 4.01.

As a result, Delancey was directly involved in the calls by getting *exactly* what was intended from them—the opportunity for Delancey to promote and sell its services through ISOs which it would also reward in the form of commissions and rights of first refusal for credit card services, as well as guarantees of continued payments. *See, e.g.*, *Aranda*, 179 F.Supp. 3d 817, 833 (N.D. Ill. 2016) (sellers ratified telemarketers' conduct by accepting the benefits of the unlawful calls in TCPA case); *Keim v. ADF Midatlantic, LLC,* 2015 WL 11713593, at *8 (S.D. Fl. 2015) (allegations sufficient to state a claim where seller accepted the benefits of the conduct by having text messages sent on its behalf to phone numbers obtained on its behalf); *Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, 2018 U.S. Dist. LEXIS 132078 (N.D. Cal. 2018) (a reasonable jury could find defendant liable on ratification theory where "Alarm.com knew of Alliance's allegedly illegal telemarketing conduct and accepted the benefits therefrom").

Moreover, the contract contemplates direct entry of qualified prospects into Delancey's computers and systems, and the ability to connect those persons to a Delancey negotiator. As the FCC and numerous courts have held, the provision of direct data entry into a principal's computer system is sufficient for a finding of agency. *In re Dish*, 28 F.C.C. Rcd. at 6592. ("For example, apparent authority may be supported by evidence that the seller allows the . . . outside

24

sales entity to enter consumer information into the seller's sales or customer systems."); *Dickson v. Direct Energy, LP*, No. 5:18-CV-00182-JRA, 2024 WL 4416856, at *9-10 (N.D. Ohio Oct. 4, 2024); *McMorrow v. Core Props., LLC*, No. 4:23-CV-00126-JAR, 2023 WL 8697795, at *13 (E.D. Mo. Dec. 15, 2023) (granting summary judgment *to plaintiff* on vicarious liability issue when plaintiff established that defendant authorized marketer to enter information into a customer information system); *Hossfeld v. DIRECTV, LLC*, No. 222CV05339JLSMAA, 2023 WL 3549742, at *6 (C.D. Cal. Mar. 31, 2023) (similarly denying motion to dismiss).

Delancey's contrary points fail. The "independent contractor" label is not determinative; the practice between the parties is crucial. At the pleading stage, a TCPA plaintiff is not required to allege that the seller "instructed" the putative agent to call this plaintiff or controlled the manner of every solicitation; those details are within the seller's possession and may be proven in discovery. *Jones*, 957 F.2d at 87; *Dolemba*, 213 F. Supp. 3d at 997; *In re DISH Network*, 28 FCC Rcd. at 6592–93 ¶ 46. As a result, Plaintiff sufficiently alleges Defendant's vicarious liability based on apparent authority and ratification based on manifestations traceable to and benefits derived directly by both Defendants, including in the course of Plaintiff's investigation.

D.     *Venue is proper because both Defendants are subject to jurisdiction here and have offices here.*

Defendant also throws in an additional argument regarding venue in its second motion to dismiss. Plaintiff will address venue in response to MJA's motion to transfer, but suffice it to say that venue is proper because both Defendant Delancey Street maintains an office in the Northern District of New York, as outlined through the Secretary of State records in Exhibit B.

## VI.     CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, to the extent additional questions remain, it should permit the Plaintiff to amend.

Dated: August 29, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

August 29, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.